Arthur W. STIGILE and Ellen
Balis, Appellees,

v.

William J. CLINTON, President,
et al., Appellants.

No. 96–5249.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 17, 1996.

Decided April 15, 1997.

Lowell V. Sturgill, Jr., Attorney, United States Department of Justice, Washington, DC, argued the cause for appellants, with whom Frank W. Hunger, Assistant Attorney General, Stephen W. Preston, Deputy Assistant Attorney General, Eric H. Holder, Jr., United States Attorney, and Leonard Schaitman, Attorney, United States Department of Justice, were on the briefs.

Benjamin S. Boyd, Washington, DC, argued the cause for appellees, with whom Arthur B. Spitzer was on the brief.

Before: SENTELLE, RANDOLPH and ROGERS, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

Concurring opinion filed by Circuit Judge ROGERS.

SENTELLE, Circuit Judge:

This is an appeal from the district court's grant of an injunction prohibiting the Office of Management and Budget from subjecting certain of its employees to random drug testing. The district court held that such drug testing violated the employees' Fourth Amendment right to be free from unreasonable searches. Because we believe the random drug testing at issue here is justified as a means of protecting the safety of the President and the Vice President, we reverse.

## Background

In 1986 President Reagan issued an executive order requiring the head of each executive agency to "establish a program to test for the use of illegal drugs by employees in sensitive positions." Exec. Order No. 12,564, 51 Fed.Reg. 32,889, 32,890 (1986). Acting pursuant to this order, the Executive Office of the President ("EOP") issued its Drug-Free Workplace Plan in July 1988. The Plan authorized mandatory testing of all job applicants and "random testing" of all applicants in sensitive positions. Testing under the plan is done in accordance with the Department of Health and Human Services' ("HHS") mandatory guidelines for drug testing by urinalysis.

The Office of Management and Budget ("OMB") is one of the entities covered by the EOP plan. In the 1992 Appendix to that plan, OMB indicated which of its employees would be subject to random testing:

With minor exceptions, all of the positions in OMB ... have been identified as testing designated positions ["TDP"].... OMB ... [has] considered the extent to which the positions considered give employees access to sensitive information at the classified level; require employees, as a condition of employment, to obtain a security clearance; require employees to engage in activities affecting public health or safety; or give employees access to areas that are frequented by the President or Vice President or areas to which access is controlled by the United States Secret Service in its role of protecting the work environment of the President and the Vice President. Presently, the only OMB positions not identified as TDP are those where an employee does not have passholder access to the Old Executive Office Building (OEOB) and there are no other testing criteria applicable to the position.

Many of the OMB's senior staff have offices in the OEOB, which is next to the White House and within the White House security perimeter. Other OMB employees are given passes because of their frequent need to visit the building for meetings with their supervisors. The OMB singles out OEOB passholders for testing because the President and the Vice President are frequently in the building. The Vice President has his office there and is in the OEOB on a daily basis. The President frequently visits for meetings with the Vice President and other officials.

OEOB passholders are able to enter the building at any time. When they enter, they are subject to magnetometer and x-ray security screening measures. OEOB passholders are also able to arrange for non-passholders to enter the building. These non-passholders must go through the normal security procedures and also have their names run through a National Crime Information Center background check.

The OMB's concern is that OEOB passholders might use their access to harm the President or the Vice President. They contend that this harm could come in one of three ways: drug-using OEOB passholders might (1) harm the President or the Vice President themselves, (2) clear into the OEOB someone intent on harming the President or the Vice President, or (3) collect information on the comings and goings of either official for some third party intent on rendering such harm.

Appellees Arthur Stigile and Ellen Balis are Financial Economists with the OMB. While their offices are in the New Executive Office Building, they each have permanent passholder access to the OEOB. The OMB originally tested only those employees hired after 1992. In 1995, however, the OMB reviewed its testing policies and decided that all OEOB passholders, regardless of when they were hired, would be subject to testing.

Stigile and Balis possess permanent OEOB passes and therefore became testing-eligible. They do not meet any of the OMB's other criteria.

In June 1995 Stigile and Balis received notice that their positions were now "Testing Designated." On June 12, 1996, Stigile was informed that he had been selected for testing. He and Balis (who has not yet been selected) immediately sought and received a temporary restraining order prohibiting the OMB from subjecting them to this testing. They also requested preliminary and permanent injunctions.

· Stigile and Balis contended before the district court that the random testing of holders of permanent OEOB passes was an unreasonable search in violation of the Fourth Amendment. They noted that there are hundreds of interns and visitors who have access to the OEOB who are not required to go through this humiliating experience. The government responded by arguing that the search was justified as a means of protecting the safety of the President and the Vice President.

The district court agreed with appellees and granted a preliminary injunction barring the OMB from including them in its random drug testing program. This appeal followed.

### Analysis

■ The Fourth Amendment states that the "right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated...." U.S. CONST. amend. IV. Government-compelled urinalysis is a search for purposes of the Fourth Amendment. *Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 617, 109 S.Ct. 1402, 1413, 103 L.Ed.2d 639 (1989). As such, it is impermissible if it is unreasonable.

In criminal cases, a government search is ordinarily unreasonable unless it is conducted pursuant to a judicial warrant issued upon probable cause. *Id.* at 619, 109 S.Ct. at 1414; *National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 665, 109 S.Ct. 1384, 1390–91, 103 L.Ed.2d 685 (1989). In *Skinner* and *Von Raab,* however, the Court

acknowledged that there are exceptions to the warrant requirement for cases where a search serves special governmental needs "beyond the normal need for law enforcement." *Skinner,* 489 U.S. at 619, 109 S.Ct. at 1414; *Von Raab,* 489 U.S. at 665, 109 S.Ct. at 1390–91. In such cases the reasonableness of a search is determined by balancing "the public interest in the ... testing program against the privacy concerns implicated by the tests, without reference to [the] usual presumption in favor of the procedures specified in the Warrant Clause." *Von Raab,* 489 U.S. at 679, 109 S.Ct. at 1398. We have applied this same test to numerous other proposed drug testing programs in recent years. *See, e.g., National Treasury Employees Union v. United States Customs Serv.,* 27 F.3d 623, 626 (D.C.Cir.1994); *Willner v. Thornburgh,* 928 F.2d 1185, 1188 (D.C.Cir.), *cert. denied,* 502 U.S. 1020, 112 S.Ct. 669, 116 L.Ed.2d 760 (1991); *Hartness v. Bush,* 919 F.2d 170, 172 (D.C.Cir.1990), *cert. denied,* 501 U.S. 1251, 111 S.Ct. 2890, 115 L.Ed.2d 1055 (1991); *National Treasury Employees Union v. Yeutter,* 918 F.2d 968, 971 (D.C.Cir. 1990); *American Fed'n of Gov't Employees v. Skinner,* 885 F.2d 884, 889 (D.C.Cir.1989), *cert. denied,* 495 U.S. 923, 110 S.Ct. 1960, 109 L.Ed.2d 321 (1990); *National Fed'n of Fed. Employees v. Cheney,* 884 F.2d 603, 608 (D.C.Cir.1989), *cert. denied,* 493 U.S. 1056, 110 S.Ct. 864, 107 L.Ed.2d 948 (1990); *Harmon v. Thornburgh,* 878 F.2d 484, 487 (D.C.Cir.1989), *cert. denied,* 493 U.S. 1056, 110 S.Ct. 865, 107 L.Ed.2d 949 (1990).

■ The public need advanced by the proposed search at issue here is the protection of the President and the Vice President. This is clearly "beyond the normal need for law enforcement." *Von Raab* and *Skinner* require therefore that we determine whether the search is reasonable by balancing the public interest served by the testing against the OEOB passholders' privacy interest in not being tested.

#### The Interests

The public interest the government is seeking to protect is undoubtedly of the utmost importance. Few events debilitate the nation more than the assassination of a Pres-

ident. The Supreme Court has recognized the importance of this interest. In *Watts v. United States,* the Court said, "[t]he Nation undoubtedly has a valid, even an overwhelming, interest in protecting the safety of its Chief Executive and in allowing him to perform his duties without interference from threats of physical violence." 394 U.S. 705, 707, 89 S.Ct. 1399, 1401, 22 L.Ed.2d 664 (1969) (per curiam); *see also White House Vigil for ERA Comm. v. Watt,* 717 F.2d 568, 572 (D.C.Cir.1983) ("The balance that must be struck between First Amendment rights and other public interests is especially delicate when one of those interests is the safety of the President."); *Sherrill v. Knight,* 569 F.2d 124, 130 (D.C.Cir.1977) ("Clearly, protection of the President is a compelling, even an overwhelming interest ...." (internal quotations and citations omitted)).

We note, lest we create an inadvertent precedent by negative implication, that the government may have an additional interest not asserted in this case. That is, in addition to *actually* protecting the President, the government also has an interest in assuring the public that it is taking every possible precaution to ensure that he is safe. The assassination of a President has an enormously disruptive impact on the life of the nation; the government has an interest in reducing the public's fear that it will have to endure this sort of disruption. Public measures to protect the President play an important role in accomplishing this goal.[1] *Cf. Harmon,* 878 F.2d at 497 (Silberman, J., concurring in part and dissenting in part) (arguing that the American people's interest in ascertaining the full commitment of "drug warriors" to the war against drugs justifies search by urinalysis).

It is also true, however, that the appellees have a serious and legitimate privacy interest in not being subject to urinalysis. The HHS regulations that govern the EOP's testing minimize the intrusion into this interest. *Von Raab,* 489 U.S. at 672 n. 2, 109 S.Ct. at 1394 n. 2. In addition, appellees' expectation of privacy is lessened because they occupy positions that require stringent background checks. *United States Customs Serv.,* 27 F.3d at 629. These factors do not, however, eliminate the appellees' privacy interest altogether. Urinalysis still requires an employee to perform a quintessentially private act in the presence of another. In *Skinner* the Court noted that it would "not characterize [the] additional privacy concerns [raised by urinalysis] as minimal in most contexts." 489 U.S. at 626, 109 S.Ct. at 1418. In *Vernonia Sch. Dist. 47J v. Acton,* — U.S. —, —, 115 S.Ct. 2386, 2396, 132 L.Ed.2d 564 (1995), the Court cautioned "against the assumption that suspicionless drug testing will readily pass constitutional muster in other contexts."

*Balancing the Interests*

As we have previously noted, the Supreme Court in *Von Raab* and *Skinner* did not "articulate an analytical rule by which legitimate drug-testing programs could be distinguished from illegitimate ones." *Harmon,* 878 F.2d at 488. *Skinner* and *Von Raab* require us rather to perform a case-by-case balancing of interests. Despite the fact-specific nature of this inquiry, there are certain broad themes in the case law that guide us in our disposition of this case.

Appellees urge us to rely on the principle that there must be a "causal connection between the employees' duties and the feared harm." *National Fed'n of Fed. Employees,* 884 F.2d at 614. In every case where the Supreme Court or this court has upheld a drug testing program for federal employees, the feared harm has been directly related to the employee's execution of his job. In *Skinner* the Department of Transportation mandated testing of employees involved in serious accidents and authorized testing of employees who had violated certain safety rules. 489 U.S. at 606, 109 S.Ct. at 1407. The Court decided that this testing was reasonable because it helped the government both to deter future accidents and to learn the cause of accidents that had already occurred. *Id.* at 628–30, 109 S.Ct. at 1419–20. In *Von Raab* the Customs Service required urinalysis of employees who sought transfer

---

1. This is not to suggest that ungrounded fears would justify searches. We only mean to make clear that we do not preclude the possibility that assurance of the public that the President's safety is being adequately protected could be a factor in a Fourth Amendment analysis.

or promotion to positions that involved drug interdiction, use of a gun, or access to sensitive information. 489 U.S. at 660–61, 109 S.Ct. at 1387–88. The Court allowed the program for the first two categories and remanded for more information for the third. It held, "[i]n light of the extraordinary safety and national security hazards that would attend the promotion of drug users to positions that require the carrying of firearms or the interdiction of controlled substances, the [program] cannot be deemed unreasonable." *Id.* at 674, 109 S.Ct. at 1395.

In the cases from our circuit on this question, the link between the harm to be avoided and the employee's execution of his job has been just as close. *See, e.g., Willner,* 928 F.2d at 1188 ("In our ... decisions concerning random drug testing of incumbents, the balance we struck turned to a large extent on the nature of the employee's position."). In *National Treasury Employees Union v. United States Customs Serv.,* we allowed testing of employees with access to the computer databases the Customs Service used to determine which ships were to be searched for drugs. 27 F.3d at 630. In *American Fed'n of Gov. Employees v. Skinner,* we referred to the "extraordinary safety sensitivity of the bulk of the" positions covered by a program held to be reasonable. 885 F.2d at 890; *see also National Fed'n of Fed. Employees,* 884 F.2d at 610 (allowing drug testing for some employees for whom a "single drug-related lapse by any covered employee could have irreversible and calamitous consequences"); *Harmon,* 878 F.2d at 490 ("*Von Raab* ... suggests that the government may search its employees only when a clear, direct nexus exists between the nature of the employee's duty and the nature of the feared violation.").

Appellees use these cases to argue that because the harm the government is seeking to prevent has nothing to do with the performance of their duties as economists for the OMB, the drug testing program must be unreasonable. They contend that random drug testing of government employees should be upheld only when there is a clear nexus between the employee's performance of his job and the harm that is sought to be avoided; that there is no such clear nexus here; and that therefore this search must be unreasonable. We reject this argument.

■ Appellees misunderstand the nature of the nexus requirement. The nexus requirement is not a mechanical test, requiring the court to ask nothing more than whether the harm to be avoided is a result of the tested employee's inability to perform his job properly. The nexus to be examined is not that between the job and the harm, but rather that between the risk posed by a drug-using employee and the evil sought to be prevented by the testing. We note that even in *Harmon,* arguably the strongest case in favor of appellees' position, the court cited *Von Raab* as "suggest[ing] that the government may search its employees only when a clear, direct nexus exists between the nature of the employees' duty and the nature of the feared violation." 878 F.2d at 490. Thus, the *Harmon* formulation describes the nexus as between the duty and the danger, not between the performance level and the danger. In this case, and perhaps others, a duty which places the employee in a position to render harm can give rise to that nexus even when the feared act by the employee would not itself be a normal part of that duty. When the link between the risk and the evil has been direct and immediate we have determined that a proposed government search is reasonable.

■ What the nexus requirement demands then is that there be an immediate, non-attenuated connection between the employee's drug use and the danger to be avoided. This is why in *Harmon* we allowed the Department of Justice to test employees holding top secret national security clearances, but did not allow the Department to test all federal prosecutors and all employees having access to grand jury proceedings. 878 F.2d at 496. For employees with access to top-secret information, a single mistake could be disastrous, while for many other Department of Justice employees the risk was not so immediate. As we said there:

> The public safety rationale adopted in *Von Raab* and *Skinner* focused on the *immediacy* of the threat. The point was that a single slip-up by a gun-carrying agent or

a train engineer may have irremediable consequences.... *Von Raab* provides no basis for extending this principle to the Justice Department, where the chain of causation between misconduct and injury is considerably more attenuated.

*Id.* (emphasis in original). Likewise, in *National Fed'n of Fed. Employees,* we allowed the Department of the Army to test randomly many different categories of employees, but did not allow it to extend the program to employees who worked in the Army's Drug Testing Laboratories. We acknowledged the interest that the government had in ensuring that these employees were drug-free, but still did not allow the testing, because "a drug-related lapse by such an employee does not portend either direct or irreparable harm, as would, for example, a lapse by an air traffic controller, pilot, or guard." 884 F.2d at 614.

In this case, the harm that the government is seeking to avoid has the necessary immediate connection to the risk posed by a drug-using employee. If the horrifying scenario that the government envisions were ever to come to pass, there would be no buffer between the drug-induced lapse by the employee and the injury to the nation's interests. There would be no opportunity for other government employees to stop or make up for the damage done by the errant employee. *See, e.g., Skinner,* 489 U.S. at 628, 109 S.Ct. at 1419; *Von Raab,* 489 U.S. at 670–71, 109 S.Ct. at 1393–94. The harm would be both "direct" and "irreparable." *National Fed'n of Fed. Employees,* 884 F.2d at 614. The appellees' nexus argument therefore fails.

Appellees also argue that the feared harm in this case is no more than "sophistic speculation." They seem to suggest that because it is extremely unlikely that an OEOB passholder would use that access to harm the President, then it must be unreasonable for the OMB to require testing on this basis. While we agree that the likelihood that the feared harm will occur is a factor to be considered, we do not agree that the low probability in this case makes the government's search unreasonable. The Supreme Court has suggested that the more serious the harm that is sought to be avoided, the more likely it is that a search that is designed to prevent the harm will be thought to be reasonable. In *Von Raab* the Court wrote, "[w]here, as here, the possible harm against which the Government seeks to guard is substantial, the need to prevent its occurrence furnishes an ample justification for reasonable searches calculated to advance the Government's goal." 489 U.S. at 674–75, 109 S.Ct. at 1395. The *Von Raab* Court elaborated on this point by citing in a footnote to circuit court opinions upholding suspicionless searches of passengers and their baggage at airports. The Court quoted the following passage from one of these opinions:

> When the risk is the jeopardy to hundreds of human lives and millions of dollars of property inherent in the pirating or blowing up of a large airplane, that danger *alone* meets the test of reasonableness, so long as the search is conducted in good faith for the purpose of preventing hijacking or like damage....

*Von Raab,* 489 U.S. at 675 n. 3, 109 S.Ct. at 1395 n. 3 (quoting *United States v. Edwards,* 498 F.2d 496, 500 (2d Cir.1974) (Friendly, J.) (emphasis in original)).

In this case the government is trying to prevent an extremely serious harm. Given this, we should hold for the government so long as there is an adequate connection between the harm sought to be avoided and the drug testing program. Here the connection is clear. This court has before noted the possibility that a drug user could be vulnerable to bribery or intimidation. *United States Customs Serv.,* 27 F.3d at 629. It is possible that a drug-using OEOB passholder could be blackmailed into using his access to the building to assist in an attack on the President. Given the importance of protecting the President's safety, this is all that is required to make this particular search reasonable. It therefore does not violate the Fourth Amendment.

Appellees make one final argument that must be addressed. They argue that random drug testing of OEOB passholders cannot be reasonable because the EOP does not test the hundreds of interns, temporary visitors, reporters, and contractors who have the same access to the OEOB as do holders of permanent OEOB passes. There are two

reasons why this argument fails. First, this case is about whether it is reasonable to administer tests to the holders of permanent passes. What the OMB does with other groups cannot control a Fourth Amendment challenge to the drug testing of permanent passholders. We cannot require the government to attack all aspects of a problem before we will uphold its right to act against a single aspect. Second, there is a significant difference between the access given to permanent passholders and the access given to these other groups. Non-permanent passholders can enter the building on a temporary basis only. Interns are granted the most access of any other group, and they have access for a maximum of three months. Permanent passholders are able to observe the interior of the building for months on end. They are thus in a superior position to acquire information on the comings and goings of the President and the Vice President. They are therefore a far more valuable source for blackmailers who wish to harm either official.

## Conclusion

Because the government's interest in protecting the safety of the President and the Vice President within the White House security perimeter outweighs appellees' interest in not being subject to urinalysis, the suspicionless drug testing of OEOB passholders is not an unreasonable search. It does not,

therefore, violate the Fourth Amendment. The district court's order is reversed.

ROGERS, Circuit Judge, concurring:

Given the precedents in which "this circuit has inched its way even farther from the core holdings in [Von Raab and Skinner[1]], repeatedly mollified by the fact that only a minuscule extra step was needed to arrive an at outcome arguably supported by precedent," *National Treasury Employees Union v. United States Customs Serv.,* 27 F.3d 623, 631 (D.C.Cir.1994) ("*NTEU*") (Wald, J. dissenting), the court's conclusion in the instant case is predictable. *Cf. Von Raab,* 489 U.S. at 680–87, 109 S.Ct. at 1398–1402 (Scalia, J., dissenting); *Hartness v. Bush,* 919 F.2d 170, 180 (D.C.Cir.1990) (Edwards, J., dissenting), *cert. denied,* 501 U.S. 1251, 111 S.Ct. 2890, 115 L.Ed.2d 1055 (1991). Following the Supreme Court in *Von Raab,* this court has already accepted the proposition that drug users pose a security risk by reason of their increased susceptibility to blackmail or bribery. *Von Raab,* 489 U.S. at 669–70, 109 S.Ct. at 1392–93; *NTEU,* 27 F.3d at 629. Given the unique access to areas within the White House security perimeter that an Old Executive Office Building ("OEOB") pass provides, the court could scarcely avoid concluding that the drug testing program of the Executive Office of the President ("EOP") is reasonably related to the goal of preventing harm to the President and Vice President. Despite the security procedures in place at the OEOB[2]

---

1. *National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989); *Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989).

2. The security measures include a background check by the Federal Bureau of Investigation of every employee who is issued a permanent OEOB pass; the employee and all other persons interviewed are asked about illegal drug use, and the background checks are updated at five-year intervals. Entry into the OEOB is restricted to passholders and pre-approved visitors who are cleared by passholders. Further, an OEOB passholder can only "clear" a non-OEOB passholder into the building for a specific appointment, and the Secret Service conducts a background check on that person with the National Crime Information Center. In addition, all persons entering the building must pass through a magnetometer and place any bags or packages in an x-ray machine.

Once inside, persons are free to move about the building, except for certain restricted areas, such as the Vice President's office. However, attendance at any function or event attended by the President or Vice President requires a special invitation. At all times, moreover, the President and the Vice President are protected by Secret Service agents.

Although the President and Vice President, by the nature of their positions, are always at some risk, a 1995 report by the Treasury Department states that:

[a]lthough ... Presidents have been exposed to deadly or lifethreatening assaults with frightening regularity, not one of these assaults has occurred within the White House Complex. Indeed, each assassination or potentially deadly assassination attempt has occurred when the Presidential protectee was away from the White House, in the proximity of a crowd. U.S. DEP'T OF TREASURY, PUBLIC REPORT OF THE WHITE HOUSE SECURITY REVIEW 92 (1995). It is unclear

and the absence of evidence of a specific threat caused by a drug-using employee of the Office of Management and Budget ("OMB"),[3] the devastating impact that an assassination of the President would have on this country and its people, and people and nations throughout the world, weighs in favor of special precautions. *See Von Raab,* 489 U.S. at 674–75 & n. 3, 109 S.Ct. at 1395 & n. 3.

That is not the end of our inquiry, however. In *Von Raab,* the Supreme Court instructed that "where a Fourth Amendment intrusion serves special governmental needs, beyond the normal need for law enforcement, the court must balance the individual's privacy expectations against the Government's interests to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context." *Id.* at 665–66, 109 S.Ct. at 1390–91; *see also Skinner,* 489 U.S. at 619–20, 109 S.Ct. at 1414–15. The question here is whether the privacy interests of OMB employees holding OEOB passes in not being subjected to random urine testing outweighs the possible risk of physical harm to the President and Vice President.

It is undeniable that protection of the President and Vice President is of paramount importance. The government has a compelling interest not only in protecting the lives of the President and Vice President, but in providing them a safe working environment where they can carry out their official duties without fear of physical danger.[4] Still, some governmental actions in the name of Presidential security would not pass constitutional muster. Few today would argue, for example, that the government could conduct a random suspicionless search of an OMB employee's home merely on the off chance that the search might reveal evidence of a threat to the President.

I write separately, therefore, to emphasize the limits of our holding in applying *Von Raab's* balancing test to a threat that relates to the situs of employment and not the nature of the job itself, and to make clear that under *Von Raab* even a governmental interest of the most compelling order must still be weighed against the competing privacy interests at stake. Three main factors influenced our holding and help define its limits: (1) the need to enable the President and Vice President to do their jobs; (2) the access needs of and consequences for OMB passholders; and (3) the nature of the drug testing program.

First, the factual setting itself limits the holding. The OEOB is directly adjacent to the White House and inside the White House security perimeter. The security perimeter is marked by a fence that runs along Pennsylvania Avenue, Seventeenth Street, East Executive Avenue, and across the front of the White House in Northwest Washington, D.C. Apart from the Executive Mansion itself, the OEOB is the only building inside this perimeter. This is the area where the President and Vice President regularly work; it is where they regularly hold meetings and receive foreign dignitaries and members of Congress; it is the area where the President and his family live. In other words, for the President and Vice President to perform *their* jobs in a reasonable fashion, heightened security measures may be justified in this well-defined and limited geographic area.

Second, because senior officials in the OMB have their offices in the OEOB, OMB employees whose own offices are located outside of the security perimeter may from

from this statement whether less serious assaults have occurred within the White House security perimeter; however, recent events by outside attackers indicate that but for intervention more serious harm could have resulted. *See, e.g, United States v. Duran,* 96 F.3d 1495 (D.C.Cir.1996).

3. The government advises that there were six positive drug tests by EOP employees under the EOP plan between 1989 and 1996. Among OMB employees, drug testing has shown less than a 1% positive testing rate since 1987. As the government notes, however, one of the principal

justifications for random drug tests is their deterrent effect, and it is impossible to know with certainty what the incidence of drug use would have been in the absence of such tests.

4. There is no reason to address whether the government has "an interest in assuring the public that it is taking every possible precaution to ensure that [the President] is safe." Majority opinion at 804. The government has not asserted that interest and there is no evidence whether the public is even aware that OMB employees are subject to drug testing.

time to time be required to come within the perimeter in order to perform their jobs. Consequently, OMB requires that all of its employees—except a small number of temporary student employees—have passes that give them free access to the OEOB. All of these employees are designated for random drug testing, notwithstanding the fact that many of them, like appellees, do not have access to any secret or top secret national security information.[5] The OMB passholders have continual access to the OEOB that affords them unique vantage points to observe the President and Vice President. Once inside the OEOB, OMB employees have an unrestricted view of the West Wing and grounds of the White House, as well as the opportunity to track the comings and goings of the President and Vice President. While this information is not "secret" in the literal sense of the word, it is "sensitive" information that is not readily available to the general public, and makes OEOB passholders, albeit in a limited way, analogous to government employees whose access to secret or top secret information causes them to be subject to random drug testing.[6] *See Hartness,* 919 F.2d at 172; *Harmon v. Thornburgh,* 878 F.2d 484, 491 (D.C.Cir. 1989), *cert. denied,* 493 U.S. 1056, 110 S.Ct. 865, 107 L.Ed.2d 949 (1990).

The access granted to OMB employees is not temporary, as is true for interns, or limited by a discrete task, as would be true of persons repairing a broken fixture, for example. Passholders also have authority to obtain access for others into OEOB, an authority non-passholders lack. While the purpose of such entries is limited to scheduled meetings, the passholders' authority is nonetheless unique as compared to others who have access to the OEOB. Here, the government has reasonably determined that appellees need this authority to perform their duties effectively, and that, consequently, they must be subject to the heightened security procedures that apply inside White House security perimeter.[7]

Third, the drug testing program is conducted in a manner that minimizes intrusion into individual privacy. Under mandatory guidelines, EOP employees who are selected for random drug testing are permitted to provide urine samples in a rest room stall or similar enclosure. Although a monitor of the same gender may be present, the monitor is not permitted to observe the employee producing the sample unless there is reason to believe the employee will alter or substitute the urine specimen. Absent a court order, or as required by the United States to defend against a challenge to an adverse personnel action, the test results may be disclosed only to a limited number of EOP officials. Like the drug testing protocols this court and the

5. As required by the EOP security plan, OMB considered four criteria in identifying which employees would be subject to drug testing:

the extent to which the positions considered give employees access to sensitive information at the classified level; require employees, as a condition of employment, to obtain a security clearance; require employees to engage in activities affecting public health or safety; or give employees access to areas that are frequented by the President or Vice President or areas to which access is controlled by the United States Secret Service in its role of protecting the work environment of the President and the Vice President.

6. In acknowledging that "it is plain that certain forms of public employment may diminish privacy expectations," *Von Raab,* 489 U.S. at 671, 109 S.Ct. at 1394, the Supreme Court stated that:

We ... agree that employees who seek promotions to positions where they would handle sensitive information can be required to submit to a urine test ... especially if the posi-

tions covered under this category require background investigations, medical examinations, or other intrusions that may be expected to diminish their expectations of privacy in respect of a urinalysis test.

*Id.* at 677, 109 S.Ct. at 1397.

7. Appellees' contention that they are willing to return their OEOB passes is unavailing. The court rejected a similar contention in *Harmon* with respect to holders of top secret clearances, noting that although many such employees rarely see top secret information, "[t]he whole point of granting top secret clearances in advance is to provide flexibility, to ensure that employees can be given access to top secret materials as soon as the need arises." 878 F.2d at 492. Similarly, the purpose of requiring OMB employees to hold OEOB passes is to provide their employer with flexibility so that they may enter the OEOB at any time on short notice. Furthermore, to the extent that appellees' duties require them to enter the OEOB, return of the passes would not eliminate the risk the government seeks to avoid.

Supreme Court have addressed in previous cases, these procedures "minimize the intrusiveness of the . . . drug-screening program." *Von Raab,* 489 U.S. at 672 n. 2, 109 S.Ct. at 1394 n. 2; *see also Harmon,* 878 F.2d at 486. While a more invasive search might violate the Fourth Amendment's reasonableness requirement, the risk of harm in the instant case outweighs the intrusion on appellees' privacy.

Although the government might have chosen other means of detecting drug activity by its employees, the Supreme Court has made it clear that the reasonableness of a drug testing program "does not necessarily and invariably turn on the existence of alternative 'less intrusive' means." *Skinner,* 489 U.S. at 629 n. 9, 109 S.Ct. at 1419 n. 9 (quoting *Illinois v. Lafayette,* 462 U.S. 640, 647, 103 S.Ct. 2605, 2610, 77 L.Ed.2d 65 (1983)); *see also National Fed'n of Fed. Employees v. Cheney,* 884 F.2d 603, 610 (D.C.Cir.1989), *cert. denied.,* 493 U.S. 1056, 110 S.Ct. 864, 107 L.Ed.2d 948 (1990). The fact that appellees work in a traditional office environment where drug use might be detected by individual monitoring, while relevant to the Fourth Amendment analysis, is not dispositive. *See NTEU,* 27 F.3d at 629; *Harmon,* 878 F.2d at 489. Although appellees may object that the government has not put forth evidence to suggest that they or their co-workers are susceptible to bribery or blackmail, the Supreme Court has already considered and rejected that argument. *See Von Raab,* 489 U.S. at 674–75, 109 S.Ct. at 1395; *id.* at 683–84, 109 S.Ct. at 1400–01 (Scalia, J., dissenting).

Accordingly, consistent with the required balancing test, and with these three factors in mind, the court concludes that the risk of harm to the President and Vice President is sufficient to outweigh the individual OMB passholder's privacy interests, given the measures taken by the government in the drug testing program to minimize the intrusion into personal privacy that urinalysis entails. As the court notes, it is "extremely unlikely" that the harm the government fears will ever come to pass, especially given the other security measures in place at the OEOB. Majority opinion at 10. Nonetheless, so long as the "possible harm against which the Government seeks to guard is substantial," *Von Raab,* 489 U.S. at 674–75, 109 S.Ct. at 1395, and has some reasonable possibility of occurring, a drug testing program, as here, that sufficiently minimizes the intrusion into employees' privacy does not violate the Fourth Amendment. Although the *Von Raab* premise that drug users are susceptible to bribery is not infinitely elastic, and could not be used to justify drug testing in every case, *see NFFE,* 884 F.2d at 614–15; *Harmon,* 878 F.2d at 490–91, here it is sufficient to tip the balance in the government's favor.