TO BE PUBLISHED IN THE OFFICIAL REPORTS

OFFICE OF THE ATTORNEY GENERAL
State of California

DANIEL E. LUNGREN
Attorney General

_____

| | | |
|---|---|---|
| OPINION | : | |
| | : | No. 97-506 |
| of | : | |
| | : | December 23, 1997 |
| DANIEL E. LUNGREN | : | |
| Attorney General | : | |
| | : | |
| ANTHONY Da VIGO | : | |
| Deputy Attorney General | : | |
| | : | |

_____

THE HONORABLE THOMAS W. SNEDDON, JR., DISTRICT ATTORNEY, COUNTY OF SANTA BARBARA, has requested an opinion on the following questions:

1. May a district attorney order a deputy district attorney to submit to an individual suspicion-based drug test in the absence of a preestablished policy respecting such testing?

2. Would the establishment by a district attorney of a policy respecting individual suspicion-based drug testing of deputy district attorneys be the subject of mandatory collective bargaining negotiations?

CONCLUSIONS

1. A district attorney may order a deputy district attorney to submit to an individual suspicion-based drug test in the absence of a preestablished policy respecting such testing.

2. The establishment by a district attorney of a policy respecting individual suspicion-based drug testing of deputy district attorneys would not be the subject of mandatory collective bargaining negotiations.

ANALYSIS

1. Absence of Preestablished Policy

The initial inquiry presented is whether a district attorney may require a deputy district attorney to submit to a test for the presence of a controlled or illegal substance based on a reasonable suspicion that the deputy is using such a substance, where no policy respecting the imposition of such a requirement had been established or promulgated. We conclude that the district attorney may require the test in the described circumstances without violating either the federal or state Constitutions.

The Fourth Amendment to the Constitution of the United States provides: "The right of the

people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause. . . ." This right of personal security is inherent in the concept of due process, and therefore applies as well to the states through the Fourteenth Amendment. (*Vernonia School Dist. 47J* v. *Acton* (1995) 515 U.S. 646, 115 S.Ct. 2386, 2390; *Elkins* v. *United States* (1960) 364 U.S. 206, 213.)

Section 1 of article I of the California Constitution, as amended by the 1972 "privacy initiative," provides: "All people are by nature free and independent and have inalienable rights. Among these are . . . pursuing and obtaining safety, happiness, and privacy." Quoting directly from the ballot argument in favor of the initiative as enacted 25 years ago, the court in *White* v. *Davis* (1975) 13 Cal.3d 757, 774-775, observed:

"`The right of privacy is the right to be left alone. It is a fundamental and compelling interest. It protects our homes, our families, our thoughts, our emotions, our expressions, our personalities, our freedom of communion, and our freedom to associate with the people we choose. . . .

"`The right of privacy is an important American heritage and essential to the fundamental rights guaranteed by the First, Third, Fourth, Fifth and Ninth Amendments to the U.S. Constitution. This right should be abridged only when there is a compelling public need. . . .'"

We are asked to assume for purposes of this opinion that the district attorney's individualized suspicion is reasonable under applicable constitutional standards (cf. *O'Connor* v. *Ortega* (1987) 480 U.S. 709, 715; *Garrison* v. *Department of Justice* (Fed.Cir. 1995) 72 F.3d 1566, 1567; *Kraslawsky* v. *Upper Deck Co.* (1997) 56 Cal.App.4th 179, 189) and that the safeguards pertaining to the procedure and protocol of the testing are constitutionally sufficient (cf. *Vernonia School Dist. 47J* v. *Acton*, *supra*, 115 S.Ct. at 2393; *Skinner* v. *Railway Labor Executives' Assn.* (1989) 489 U.S. 602, 626; *Hill* v. *National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 41-43).

With these assumptions in mind, we examine recent federal and state cases involving drug testing of public employees and others. In *Skinner* v. *Railway Labor Executives' Assn.*, *supra*, 489 U.S. 602, federal regulations required that railroad companies conduct blood and urine tests of designated employees following major train accidents and authorized them to administer breath or urine tests to employees who had violated specified safety rules. The court held that the tests were reasonable under the Fourth Amendment even without the requirement of a search warrant or the existence of any reasonable suspicion that a particular employee may be impaired by drugs or alcohol. Of particular significance here are the following remarks of the court with regard to the minimal nature of the intrusion:

". . . Ordinarily, an employee consents to significant restrictions in his freedom of movement where necessary for his employment, and few are free to come and go as they please during working hours. See, *e.g.*, *INS* v. *Delgado 466 U.S.*, at 218. Any additional interference with a railroad employee's freedom of movement that occurs in the time it takes to procure a blood, breath, or urine sample for testing cannot, by itself, be said to infringe significant privacy interests.

"Our decision in *Schmerber* v. *California* [(1966) 384 U.S. 757] indicates that the same is true of the blood tests required by the FRA regulations. In that case, we held that a State could direct that a blood sample be withdrawn from a motorist suspected of driving while intoxicated, despite his refusal to consent to the intrusion. . . . *Schmerber* thus confirmed `society's judgment that blood tests do not constitute an unduly extensive imposition on an individual's privacy and bodily integrity.'" (*Id.*, at pp. 624-625.)

While for purposes of this opinion we may assume that a sufficient suspicion respecting a particular individual does exist, the *Skinner* court, in reference to the countervailing significance of the "important" governmental interest in testing even without a showing of "individualized suspicion," stated:

> ". . . In limited circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion. We believe this is true of the intrusions in question here." (*Id*., at p. 624.)

With respect to the government's interest, the court further noted:

> "The Government's interest in regulating the conduct of railroad employees to ensure safety, like its supervision of probationers or regulated industries, or its operation of a government office, school, or prison, `likewise presents "special needs" beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements.'" (*Id.*, at p. 620.)

> In the companion case of *Treasury Employees* v. *Von Raab* (1989) 489 U.S. 656, the court upheld drug testing of United States Customs Service agents involved in drug interdiction and enforcement activities, noting the government's "compelling interest in ensuring that front-line interdiction personnel are physically fit and have unimpeachable integrity and judgment." (*Id*., at p. 670.)

> More recently, in *Vernonia School Dist. 47J* v. *Acton*, *supra*, 115 S.Ct. 2386, the court considered the constitutional sufficiency of random testing for participation in interscholastic athletics. The policy was sustained from attack under the Fourth and Fourteenth Amendments where it was shown that athletes were leaders in the school drug culture and that drug use increased the risk of sports-related injury. In connection with the nature and immediacy of the countervailing governmental concern, the court observed:

> ". . . In both *Skinner* and *Von Raab*, we characterized the government interest motivating the search as `compelling.' It is a mistake, however, to think that the phrase `compelling state interest' in the Fourth Amendment context, describes a fixed, minimum quantum of governmental concern, so that one can dispose of a case by answering in isolation the question: Is there a compelling state interest here? Rather, the phrase describes an interest which appears *important enough* to justify the particular search at hand, in light of other factors which show the search to be relatively intrusive upon a genuine expectation of privacy. Whether that relatively high degree of governmental concern is necessary in this case or not, we think it is met." (*Id*., at pp. 2394-2395.)

> In *Hill* v. *National Collegiate Athletic Assn.*, *supra*, 7 Cal.4th 1, the California Supreme Court upheld a random testing requirement by a private association of colleges for participation in intercollegiate athletic postseason championships. While the standard for approving the actions of government agencies may not apply to private entities (*id*., at pp. 22, 38-39), the court in its discussion alluded to countervailing governmental interests under the privacy initiative (Cal. Const., art. I, § 1) as follows:

> "Even within the context of government information-gathering, the limited references in the ballot arguments [Ballot Pamp., Proposed Stats. and Amends. to Cal. Const. with arguments to voters, Gen. Elect. (Nov. 7, 1972) pp. 26-28] to `compelling' necessity . . . are not consistent. . . . [A] rebuttal to the argument against the Privacy Initiative . . . stated in part: `The right to privacy will not destroy welfare nor undermine any important government program. It is limited by "compelling public necessity" *and the public's need to know. [The Privacy Initiative]*

*will not prevent the government from collecting any information it legitimately needs. It will only prevent misuse of this information for unauthorized purposes and preclude the collection of extraneous or frivolous information.'* (Ballot Argument, *supra*, at p. 28, italics added.)

"The references to a public `need to know' and to information `legitimately need[ed]' by government serve to limit and narrow the prior reference to `compelling public interest.' A mere `legitimate need' for information may be less than overwhelming. Similarly, a type of information may not be `extraneous' or `frivolous' in pursuit of a government task, but the government's claim of entitlement may not be `compelling.' For example, if a perceived `need' merely represents greater efficiency or effectiveness in the performance of some public function, but its fulfillment is by no means indispensable to government existence or operation, it might not be regarded as `compelling.' And yet, as the ballot arguments reveal, the framers of the Privacy Initiative preferred, at least in responding to the arguments of their opponents, a more flexible and pragmatic approach to the privacy right than the isolated term `compelling public interest' appears to demand." (*Id*., at pp. 21-22.)

Thus, where the elements of an invasion of privacy are established, i.e., (1) a legally protected privacy interest, (2) a reasonable expectation of privacy, and (3) a serious invasion (id., at 39-40), the violation may be justified because it substantially furthers one or more countervailing legitimate interests (*id*., at pp. 29, 38, 40). **Footnote No. 1**

The most recent California Supreme Court case of interest, *Loder* v. *City of Glendale* (1997) 14 Cal.4th 846, involved drug testing of applicants for city employment. The court reaffirmed the *Hill* criteria, **Footnote No. 2** but made clear that the primary focus of a state constitutional privacy claim in the employee drug testing context involves a balancing test, i.e., balancing the drug test's intrusion on the reasonable expectations of the employee against the drug test's promotion of the employer's legitimate interests. (*Id*., at pp. 891-898; see also *Hill* v. *National Collegiate Athletic Assn*., *supra*, 7 Cal.4th at 55; *Kraslawsky* v. *Upper Deck*, *supra*, 56 Cal.App.4th at 186-187.) The same test is used in Fourth Amendment cases. (*Treasury Employees* v. *Von Raab*, *supra*, 489 U.S. at 679; *Stigile* v. *Clinton* (D.C.Cir. 1997) 110 F.3d 801, 803.)

We now proceed, in accordance with the criteria set forth above, to balance the intrusion in question **Footnote No. 3** upon the employee's reasonable expectation of privacy against the employer's legitimate interests.

A. Reasonable expectation of privacy

Does a deputy district attorney have a reasonable expectation of privacy against a reasonable suspicion-based drug test in the absence of a preestablished policy respecting such testing? Even when a legally cognizable privacy interest is present, other circumstances may affect a person's reasonable expectation of privacy. (*Hill* v. *National Collegiate Athletic Assn.*, *supra*, 7 Cal.4th at 36.) In the absence of individualized suspicion as the basis for testing, for example, the result of the balancing test may differ; i.e., the employee may have a stronger reason to expect to maintain his privacy, and the employer may have less need for the test. (See, e.g., *Kraslawsky* v. *Upper Deck*, *supra*, 56 Cal.App.4th at 187-188.) We assume here that the factor of individualized suspicion is present, and the reasonable expectation of privacy would be diminished to that extent.

Another circumstance the presence of which would diminish a reasonable expectation of privacy is advance notice. (*Hill* v. *National Collegiate Athletic Assn*., *supra*, 7 Cal.4th at 36; *Ingersoll* v. *Palmer* (1987) 43 Cal.3d 1321, 1346 [sobriety checkpoints].) As in the absence of individualized suspicion, in the absence of a preestablished policy disseminated among the employees or other form of advance notice, the result of the balancing test may differ; i.e., the employee may have a stronger reason to expect to maintain

his privacy, and the employer may have less need for the test. Hence, the absence of an established policy would ordinarily enhance a reasonable expectation of privacy.

Nevertheless, the absence of such a policy does not create an expectation of privacy where it would not otherwise exist. (*O'Connor* v. *Ortega*, *supra*, 480 U.S. at 719.) The office of the district attorney is, of course, a public office. In the context of law enforcement **Footnote No. 4** specifically, there is a diminished expectation that an employee's own conduct is immune from public scrutiny. It is obvious that a deputy district attorney's credibility is a critical factor in his effectiveness, and is predicated upon his own exemplary compliance with the law. Indeed, the public has a corresponding expectation that in the enforcement of the law by a deputy district attorney, the integrity of and the confidence in the criminal justice system will be maintained. **Footnote No. 5**

Finally, as the apparent danger to the public arising from the use of drugs by a public employee increases, the less reasonable will be the employee's subjective expectation of privacy. In the case of a deputy district attorney, this danger lies not only in the impairment of his prosecutorial duties resulting from the use of drugs, but also in the possible risk of the deputy's complicity with drug dealers in the distribution of illegal drugs throughout the community.

B.        Countervailing government interests

In a divided opinion, the court in *Harmon* v. *Thornburgh* (D.C. Cir. 1989) 878 F.2d 484, held that the government's interests in the integrity of its workforce and public safety did not justify the random testing of federal prosecutors by the United States Department of Justice, except with respect to those employees who were responsible for the enforcement of federal narcotics laws. (*Id*., at p. 490.) However, here, we are not concerned with suspicionless (random) testing. Moreover, *Harmon* predates the Supreme Court decisions in *Skinner* and *Von Raab* quoted above, which dealt with random testing. (Compare *Lovvorn* v. *City of Chattanooga* (6th Cir. 1988) 846 F.2d 1539, vacated, with *Penny* v. *Kennedy* (6th Cir. 1990) 915 F.2d 1065 [superseding decision in same case].) Additionally, we are dealing with a district attorney's office which, unlike the United States Department of Justice, is not comprised of entire divisions of prosecutors in specialties, e.g., antitrust and securities fraud, not involved in or connected with narcotics offenses. To the contrary, in a typical district attorney's office, a deputy district attorney may be assigned to a narcotics case or will have access to narcotics involved in such a case and to information relating to any drug investigation or prosecution within the office, including access to grand jury information relating to any drug investigation. **Footnote No. 6** Thus, the following comments in the concurring and dissenting opinion of Judge Silberman in *Harmon* would, in our view, apply generally to the prosecutors in a district attorney's office:

"The analogy may not be precise, but the federal government's efforts to contain and beat back the drug scourge that affects our society depend importantly on convincing all Americans that drug use is as much a danger to them and to our country as is an external enemy. Obviously, millions of Americans are not yet persuaded. That appears to explain why the Supreme Court [in *Treasury Employees* v. *Von Raab*] - notwithstanding the lack of evidence that a substantial number of Customs Service personnel use drugs - approved the drug-testing program. If even one Customs agent were discovered to be a drug user, the ensuing publicity, both within the agency and without, would likely have a far more corrosive impact on the government's effort to fight drug use than would the conduct of that one agent.

"Federal prosecutors and their support staff engaged in drug prosecution are no less committed to the war against drugs than are the Customs Service personnel. They are, in this sense, drug warriors. The down-side risk of having even one of them discovered as an apostate, as a traitor who consorts with and aids the government's and society's mortal enemy, is, as with the soldier in wartime, disproportionately large. For that reason, I think that all those employees in the Justice Department whose responsibilities are related to drug prosecution may be tested

under the Attorney General's program." (*Harmon* v. *Thornburgh, supra,* 878 F.2d at 497; fn. omitted.)

We are in accord with the view that a district attorney's office, as part of the criminal justice system for the preservation of the public safety, presents "`special needs' beyond normal law enforcement. . . ." (Cf. *Skinner* v. *Railway Labor Executives' Assn.*, *supra*, 489 U.S. at 620; see also *Treasury Employees* v. *Von Raab*, *supra*, 489 U.S. at 665; *Stigile* v. *Clinton*, *supra*, 110 F.3d at 803.) Those needs would militate in favor of individualized reasonable suspicion-based drug testing and would outweigh its intrusion on the reasonable expectation of a particular deputy district attorney.

It is therefore concluded that a district attorney may order a deputy district attorney to submit to an individual suspicion-based drug test in the absence of a preestablished policy respecting such testing.

### 2. Need for Collective Bargaining Negotiations

The second inquiry is whether the establishment and promulgation by a district attorney of a policy respecting the imposition upon a deputy district attorney of a required test for the presence of a controlled or illegal substance based on a reasonable suspicion that the deputy is using such a substance would be subject to the "meet and confer" prerequisites of the Meyers-Milias-Brown Act (Gov. Code, §§ 3500-3510; "Act") **Footnote No. 7** governing collective bargaining negotiations. We conclude that such policy would not be a subject of negotiation under the Act.

The Act governs the rights of employees of public agencies to organize and negotiate with their employers. (§§ 3500, 3502.) "Recognized employee organizations shall have the right to represent their members in their employment relations with public agencies." (§ 3503.) "The scope of representation shall include all matters relating to employment conditions and employer-employee relations, including, but not limited to, wages, hours, and other terms and conditions of employment, except, however, that the scope of representation shall not include consideration of the merits, necessity, or organization of any service or activity provided by law or executive order." (§ 3504.) "Except in cases of emergency . . . the governing body of a public agency . . . shall give reasonable written notice to each recognized employee organization affected of any ordinance, rule, resolution, or regulation directly relating to matters within the scope of representation proposed to be adopted by the governing body . . . and shall give such employee organization the opportunity to meet with the governing body. . . ." (§ 3504.5.) "The governing body of a public agency . . . shall meet and confer in good faith regarding wages, hours, and other terms and conditions of employment with representatives of such recognized employee organizations . . . and shall fully consider such presentations as are made by the employee organization on behalf of its members prior to arriving at a determination of policy or course of action." (§ 3505.)

Would the establishment of a policy by a district attorney respecting individualized suspicion-based drug testing of a deputy district attorney constitute a term or condition of employment falling within the "scope of representation" of section 3504, or would it partake rather of the "merits, necessity, or organization of any service or activity provided" by the district attorney? In *Fire Fighters Union* v. *City of Vallejo* (1974) 12 Cal.3d 608, 616, the Supreme Court observed with respect to section 3504 that "the Legislature included the limiting language not to restrict bargaining on matters directly affecting employees' legitimate interests in wages, hours and working conditions but rather to forestall any expansion of the language of `wages, hours and working conditions' to include more general managerial policy decisions."

The following cases serve to define the issues in the present context. In *Fire Fighters Union* v. *City of Vallejo*, *supra*, 12 Cal.3d 608, the court, considering whether a "manning schedule" fell within the scope of representation, observed that if the schedule "primarily" involved employee workload and employee safety, it would relate to a condition of employment. If it "primarily" involved the city's fire protection

policy, it would not. (*Id*., at pp. 619-621.)

In *San Jose Peace Officers' Assn.* v. *City of San Jose* (1978) 78 Cal.App.3d 935, the city adopted a regulation governing the discharge of firearms by peace officers. The court held that the regulation was a managerial decision since employee safety was not the city's primary motivation in adopting it. (*Id*., at p. 946.) As stated by the court, "the use of force policy is primarily a matter of public safety" which impinges only indirectly on a condition of employment. (*Id*., at p. 947.)

In *Johnson-Bateman Co.* (1989) 131 Lab.Rel.Ref.Manual (BNA) p. 1393, the National Labor Relations Board **Footnote No. 8** ruled that the drug testing of employees who require medical treatment for work injuries would be a mandatory subject of collective bargaining. (*Id*., at p. 1396.) The board determined that the testing requirement would be "germane to the working environment," in that it "substantially var[ies] both the mode of the investigation and the character of proof on which an employee's job security might depend." (*Id*., at p. 1397.) Further, the testing would be "outside the scope of managerial decisions lying at the core of entrepreneurial control," since it would be "a more limited decision directed toward reducing workplace accidents and attendant insurance rates" (*id*., at pp. 1397-1398).

Finally, in *Holliday* v. *City of Modesto* (1991) 229 Cal.App.3d 528, a city fire fighter, who had been cited for drug use by city police officers, to submit to drug testing as a condition of continued employment. **Footnote No. 9** However, the trial court made no findings regarding the city's purposes in ordering the drug testing, and no evidence was offered that public safety was the primary consideration. (*Id*., at pp. 538-539.) Accordingly, the Court of Appeal concluded:

> "Because of the fundamental differences between the use of force policy reviewed in the *San Jose* case and the drug-test order involved here, and because of the absence of evidence showing that respondents' primary purpose was the protection of the public safety, we cannot apply *San Jose* in this case." (*Id*., at p. 539.)

Turning to the matter presented for consideration, we find that the policy in question, while it impinges indirectly upon a condition of employment, relates primarily to a matter of public safety. As noted above, the danger to the public arising from the use of drugs by a deputy district attorney arises not only from the effect of impaired capacity upon the technical aspects of performing official duties, but also from the effect that the cost and availability of drugs may have upon the willingness to remove the suppliers from the community. Investigations and prosecutions may be compromised, evidence may be concealed, and testimony may be managed or controlled. The release into the community of drug suppliers and distributors would, in our view, constitute such an extreme and unacceptable danger to the public safety as to fully justify a suspicion-based test for the use of such illicit substances by a deputy district attorney.

It is therefore concluded that the establishment by a district attorney of a policy respecting individual suspicion-based drug testing of deputy district attorneys would not be the subject of mandatory collective bargaining negotiations.

* * * * *

**Footnote No. 1**
Of course, an individual confronted with a defense based on countervailing interests may undertake the burden of demonstrating the availability and use of protective measures, safeguards, and alternatives that would minimize the intrusion on privacy interests. (*Id*., at pp. 38, 40.) However, the least intrusive alternative is not always feasible. (*Id*., at pp. 49-50.)

**Footnote No. 2**
The *Loder* court also reaffirmed its analysis in *Hill* regarding the application of the compelling interest standard:

> ". . . The court in *Hill* rejected the proposition `that every assertion of a privacy interest under

article I, section 1, must be overcome by a "compelling interest"' (7 Cal.4th at pp. 34-35) and explained that `[in] view of the far-reaching and multi-faceted character of the right to privacy, such a standard imports an impermissible inflexibility into the process of constitutional adjudication.' (*Id*. at p. 35.) In this regard, the court noted that, although some of the prior California decisions applying the state constitutional privacy provision `use "compelling interest" language[,] others appear to rely on balancing tests giving less intense scrutiny to nonprivacy interests. The particular context, i.e., the specific kind of privacy interest involved and the nature and seriousness of the invasion and any countervailing interests, remains the critical factor in the analysis. Where the case involves an obvious invasion of an interest fundamental to personal autonomy e.g., freedom from involuntary sterilization or the freedom to pursue consensual familial relationships, a "compelling interest" must be present to overcome the vital privacy interest. If, in contrast, the privacy interest is less central, or in bona fide dispute, general balancing tests are employed.' (*Id*. at p. 34, fn. omitted.)" (*Id*., at p. 890.)

**Footnote No. 3**
Both the collection and the subsequent analysis of biological samples constitute searches under the Fourth and Fourteenth Amendments (*Vernonia School Dist. 47J* v. *Acton*, *supra*, 115 S.Ct. at 2390-2391; *Skinner* v. *Railway Labor Executives' Assn.*, *supra*, 489 U.S. at 616-618), as well as an invasion of privacy under California Constitution, article I, section 1 (*Hill* v. *National Collegiate Athletic Assn*., *supra*, 7 Cal.4th at 40-55).

**Footnote No. 4**
The term "law enforcement personnel" includes public prosecutors. (70 Ops.Cal.Atty.Gen. 183, 185 (1987); see also 75 Ops.Cal.Atty.Gen. 223, 227 (1992).)

**Footnote No. 5**
Accordingly, it has been stated that a law enforcement agency must promptly, thoroughly, and fairly investigate allegations of officer misconduct. (*Pasadena Police Officers Assn*. v. *City of Pasadena* (1990) 51 Cal.3d 564, 572.)

**Footnote No. 6**
It is noted that in this state, a county's civil law is, in the great majority of instances, performed by the separate office of the county counsel. (Gov. Code, §§ 27642, 26529.) It is also recognized that in the largest counties within the state certain specialties within the district attorney's office, e.g., consumer fraud, may be remote both functionally and physically to narcotics enforcement activities. Essentially, then, while we respond generally to the inquiry as presented, the situation in a particular county may be factually distinguished and present a closer question.

**Footnote No. 7**
Hereinafter, undesignated section references are to the Government Code.

**Footnote No. 8**
California courts look to federal case law interpreting the National Labor Relations Act (29 U.S.C. § 151 et seq.) as an aid to interpreting parallel provisions of the Act. (See *Public Employees Assn.* v. *Board of Supervisors* (1985) 167 Cal.App.3d 797, 806-807.)

**Footnote No. 9**
The court noted: "If a matter relates to the employment conditions of a single employee, even one who is reasonably suspected of drug use, it appears to fall within the scope of representation." (*Id*., at p. 537.)